**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
CARLA MERCEDEZ, *on behalf of*
*herself, FLSA Collective Plaintiffs,*
*and the Class*,

                                        Plaintiff,

                        -against-

COMPASS GROUP USA, INC.,

                                      Defendant.
------------------------------------------------------------------X

**25 Civ. 942 (GS)**

**OPINION & ORDER**

**GARY STEIN, United States Magistrate Judge:**

Plaintiff Carla Mercedez ("Plaintiff" or "Mercedez") brings this action against

Defendant Compass Group USA, Inc. ("Defendant" or "Compass") alleging, *inter*

*alia*, that Compass unlawfully undercompensated Plaintiff and others similarly

situated in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et*

*seq.*, and New York law.  (Dkt. No. 1).  Compass moves to compel Mercedez to

arbitrate her claims under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*,

and to stay this action pending arbitration.  (Dkt. No. 19).  For the reasons set forth

below, Compass's motion is **DENIED**.

**BACKGROUND**[1]

**A.    Plaintiff's Allegations**

Compass operates a number of Starbucks and other fast-food establishments

in New York City.  (Compl. ¶¶ 6-8).  In October 2021, Mercedez was hired by

---

[1] These background facts are based on the allegations in Plaintiff's Complaint, filed on January 31,
2025 (Dkt. No. 1 ("Compl.")), and the declarations and attached exhibits submitted in connection

1

Compass to work as a barista at the Starbucks located at 45 West 4th Street, New York, NY. (*Id.* ¶ 57). Mercedez worked for Compass until approximately February 2023, when she was terminated. (*Id.*).

Mercedez, who was a union member while employed by Compass (*id.* ¶ 19), brings this action on behalf of an FLSA collective, and a class, consisting of all non-exempt employees working for fast-food establishments operated by Compass in New York City. (*Id.* ¶¶ 45-56). Plaintiff complains about several categories of allegedly unlawful behavior by Compass.

First, Mercedez alleges that Compass failed to pay overtime compensation as required under the FLSA and New York Labor Law ("NYLL") due to timeshaving. (*Id.* ¶¶ 1, 2). During her employment, Mercedez alleges that managers would instruct her and similar employees to clock-out at the end of their scheduled shift, yet required them to engage in close-out proceedings before leaving. (*Id.* ¶ 59). These close-out procedures would take approximately 30 minutes to complete and occurred at least twice a week. (*Id.*). Mercedez was never compensated for this time. (*Id.*). Additionally, Mercedez alleges that at least once a week, managers would instruct her and similar employees to perform work functions while clocked-out for meal breaks. (*Id.* ¶ 60). These interruptions would typically last around 5-10 minutes, but managers would demand that employees remain clocked-out, and the employees were never compensated for this time. (*Id.*).

Second, Mercedez alleges that during her employment, she was scheduled to

---

with Compass's motion to compel arbitration from Compass employees Sandy Bailey (Dkt. No. 22-2 ("Bailey Decl.")) and Rosa Rosario (Dkt. No. 23-2 ("Rosario Decl.")).

work forty-five hours per week. (*Id.* ¶ 58). However, Compass would frequently change the hours she was to work at the last minute without notice. (*Id.*). Mercedez alleges that she was never awarded premium pay for these shift changes, which constitutes a violation of the New York City Fair Workweek Law ("NYCFWL"). (*Id.* ¶¶ 62, 97). Mercedez also alleges that Compass reduced her weekly hours by more than 15% and ultimately terminated her employment without cause or economic justification in violation of the NYCFWL. (*Id.* ¶¶ 63, 64).

Third, Mercedez alleges that Compass did not provide proper wage statements in violation of the Work Theft Protection Act ("WTPA"), which is incorporated into the NYLL. (*Id.* ¶ 67). Mercedez alleges that proper statements would have made it "self-evident" that she was being underpaid, and would have required Compass to increase her pay or acknowledge that it was violating the law. (*Id.* ¶¶ 69-70). Additionally, Mercedez alleges that the reduced reported income reduced her social security benefits. (*Id.* ¶¶ 73, 74, 76).

Finally, Plaintiff's Complaint challenges the validity of the Compass form arbitration agreement that is the basis for Defendant's motion to compel arbitration. The Complaint alleges that the arbitration agreement is unenforceable both because it is an unlawful "side agreement" negotiated outside the collective bargaining context, in violation of the National Labor Relations Act ("NLRA"), and because it is void for want of consideration. (*Id.* ¶¶ 17-34).

Based on these allegations, Plaintiff asserts a claim for damages (including liquidated damages) under the FLSA (*id.* ¶¶ 82-92), a claim for damages and

3

statutory penalties under the NYLL and NYCFWL (*id.* ¶¶ 93-98), and a claim for injunctive relief to require Compass to notify employees and former employees that its form arbitration agreement is invalid (*id.* ¶¶ 99-104).

### B.    The Arbitration Agreement

Individuals apply for jobs at Compass through an online portal known as "PeopleHub," a human resources software system.  (Bailey Decl. ¶ 3).  Applicants complete a pre-employment onboarding process, which includes the opportunity to review Compass's arbitration agreement after submitting their application.  (*Id.* ¶ 6).  If the applicant is offered a position, they receive an email informing them they have received a "conditional offer of employment."  (*Id.* ¶ 8).  To be approved and hired, the applicant must complete a series of onboarding paperwork, including the arbitration agreement.  (*Id.*).

Compass's arbitration agreement is a one-page document entitled "Mutual Arbitration Agreement."  (*Id.* Ex. A).  Plaintiff digitally signed this Agreement on September 28, 2021, prior to her first day of work.  (*Id.* ¶ 17 & Ex. A; *see* Compl. ¶¶ 18, 57).

The Mutual Arbitration Agreement ("Agreement") sets forth the parties' agreement "to utilize binding individual arbitration as the sole and exclusive means to resolve all legal claims" between them, "including without limitation those that may arise out of or be related to [Mercedez's] employment, compensation, or

termination of employment." (Bailey Decl. Ex. A).  The Agreement goes on to specify that

> [Mercedez] and the Compass Entities waive our rights to bring a claim against the other in a court of law and in doing so, specifically waive our rights to a jury.  Except as provided below,[2] any claim, dispute, and/or controversy that [Mercedez] may have against the Compass Entities (or their directors, officers, employees, or agents), or that the Compass Entities may have against [Mercedez], shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act ("FAA"), except that if for any reason arbitration is unavailable under the FAA, then the law of the state in which [Mercedez] last worked for any of the Compass Parties shall govern this Agreement.

(*Id.* (emphasis omitted)).

The Agreement also contains a delegation clause ("Delegation Clause") confiding issues of arbitrability to the arbitrator.  The Delegation Clause states:

> [T]he arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the enforceability, applicability, or interpretation of this Agreement, including without limitation any claim that it is void or voidable.  Thus, except as noted in the immediately preceding paragraph, [Mercedez] and the Compass Parties voluntarily waive the right to have a court determine the enforceability of this Agreement but may seek a court order delegating such questions to the arbitrator.

(*Id.*).

The Agreement provides that the arbitrator will be a retired state or federal court judge in the state in which Mercedez was employed, or an otherwise qualified

---

[2] The exceptions include claims arising under the NLRA that are brought before the National Labor Relations Board; claims for unemployment insurance or medical or disability benefits; claims to enforce the Agreement, compel arbitration, or enforce, modify, or vacate an arbitration award; and claims for which the Agreement would be invalid as a matter of federal or state law.  (*Id.*).

individual to whom the parties mutually agree.  (*Id.*).  With respect to the costs of arbitration, the Agreement makes clear that Compass

> shall pay all costs unique to arbitration, but if [Mercedez is] the party initiating the claim, [she] agree[s] to pay an amount equal to the filing fee to initiate the claim in court in [her] home state.  Except as determined by the arbitrator in accordance with controlling law, [Mercedez] and the Compass Related Entities will pay [their] own attorneys' fees and costs that are not unique to arbitration.

(*Id.*).

Finally, the Agreement allowed Mercedez to opt out of the Agreement. Mercedez was able to do so "by sending written correspondence" to Compass's Office of General Counsel within thirty days of the Agreement's execution; Compass agreed to reimburse her for the postage costs.  (*Id.* (emphasis omitted)).  The Agreement states that, if Mercedez did not opt out in accordance with this procedure, "the Agreement is binding."  (*Id.*).

### C.    Plaintiff's Union Membership

The Starbucks at which Mercedez worked, which is on the campus of New York University in Washington Square and is known as the NYU-Starbucks, is a unionized location.  (Rosario Decl. ¶ 3).  As a result, upon her hiring, Mercedez became a member of Local 1102 RWDSU UFCW (the "Union"), which represents a bargaining unit of food service employees at the NYU-Starbucks at which Plaintiff worked.  (*Id.* & Ex. A, Articles 2 & 3.B; *see* Compl. ¶ 19).

As a member of the Union, Mercedez was protected by the provisions of the Collective Bargaining Agreement ("CBA") between the Union and Chartwells, the division of Compass that operates the NYU-Starbucks location.  (Rosario Decl. ¶ 3 &

Ex. A; Bailey Decl. ¶ 3). The CBA was in effect from July 1, 2019 through June 30, 2023, encompassing Mercedez's entire tenure as a Compass employee. (Rosario Decl. ¶ 3). Under the CBA, Compass recognized the Union "as the sole collective bargaining agent for the food service employees employed by Chartwells at New York University." (CBA Article 2).

The CBA contains a grievance procedure that must be followed "[i]f any disagreement arises over the application or interpretation of this [CBA]." (CBA Article 19). Under the grievance procedure, if Compass and the Union fail to settle a grievance presented by an aggrieved employee through informal discussions, the matter must be submitted to binding arbitration. (*Id.*). Compass does not contend that Mercedez's claims in this action are subject to the CBA's grievance procedure. (*See* Dkt. No. 32 at 9 n.7). The CBA is otherwise silent on how disputes between employees and Compass are to be resolved.

## D.    Procedural History

Mercedez commenced this action on January 31, 2025, nearly two years after the termination of her employment in February 2023. (Dkt. No. 1). On May 5, 2025, Compass filed its instant motion, seeking an order compelling arbitration or, in the alternative, partially dismissing the Complaint for failure to state a claim and for lack of standing. (Dkt. No. 19). The motion was accompanied by a supporting memorandum (Dkt. No. 20 ("Def. Br.")) and Declarations from Compass's outside counsel, Seth Kaufman (Dkt. No. 21-1 ("Kaufman Decl.")), Compass HRIS Operations Manager Sandy Bailey (Dkt. No. 22-2 ("Bailey Decl.")),

and Compass Labor Relations Director Rosa Rosario (Dkt. No. 23-2 ("Rosario Decl.")).[3]

Mercedez submitted her brief in opposition to Compass's motion to compel arbitration on May 16, 2025, together with a cross-motion seeking, *inter alia,* certification of a class under Fed. R. Civ. P. 23 for the purposes of her challenge to the Mutual Arbitration Agreement.  (Dkt. Nos. 28 & 29 ("Pl. Br.")).  The Court held a conference on May 22, 2025.  At the conference, it was agreed that the Court would resolve Defendant's motion to compel arbitration before addressing the other issues raised by the parties' motions.  As a result, Mercedez agreed to withdraw her cross-motion for class certification without prejudice.  (Dkt. No. 31).  In addition, as Mercedez stated that she wished to amend her complaint before responding to Compass's alternative motion for partial dismissal under Fed. R. Civ. P. 12, further briefing on the motion to dismiss was likewise deferred.  (*Id.*).  Compass filed its reply brief, limited to the arbitration issue, on May 30, 2025.  (Dkt. No. 32 ("Reply")).

On December 3, 2025, the Court held oral argument on the motion.  (Dkt. No. 33; *see* Dkt. No. 37, Transcript of Proceedings, Dec. 3, 2025 ("Tr.")).  Following oral argument, on December 10, 2025, Mercedez submitted a supplemental briefing letter (Dkt. No. 35 ("Pl. Supp. Ltr.")), and Compass submitted a similar letter the same day.  (Dkt. No. 36 ("Def. Supp. Ltr.")).

---

[3] On May 9, 2025, the parties consented to the undersigned's jurisdiction over all proceedings in this case pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Dkt. No. 26).

## LEGAL STANDARDS

The Federal Arbitration Act ("FAA"), which "reflects a liberal federal policy favoring arbitration agreements," *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (citations omitted), dictates that any contract containing a binding arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. Section 3 of the FAA "provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration," *EEOC v. Waffle House, Inc.*, 534 U.S. 754, 761 (2002), and Section 4 of the FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement," 9 U.S.C. § 4. "A party has 'refused to arbitrate' within the meaning of Section 4 if it 'commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so.'" *Shenzhen Xingchen Xuanyuan Indus. Co. v. Amazon.com Servs. LLC*, 735 F. Supp. 3d 453, 461 (S.D.N.Y. 2024) (quoting *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004)).

"Arbitration is a matter of contract, and 'the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.'" *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 828 (S.D.N.Y. 2020) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). "To rule on a petition

to compel arbitration, the Court must decide two main issues: '(1) whether the parties agreed to arbitrate, and (2) if so, whether the scope of the agreement encompasses the claims at issue.'" *Abuda v. Strongblock*, No. 22 Civ. 10869 (LTS) (BCM), 2023 WL 6294205, at *4 (S.D.N.Y. Sept. 27, 2023) (quoting *Cornelius v. Wells Fargo Bank, N.A.*, No. 19 Civ. 11043 (LJL), 2020 WL 1809324, at *3 (S.D.N.Y. Apr. 8, 2020)); *see Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996).

The party seeking to compel arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101-02 (2d Cir. 2022). "Whether an arbitration agreement exists is a matter of state contract law." *Whyte v. WeWork Companies, Inc.*, No. 20 Civ. 1800 (CM), 2020 WL 3099969, at *3 (S.D.N.Y. June 11, 2020). "This burden does not require the moving party to show initially that the agreement would be *enforceable*, merely that one existed." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (emphasis in original). Accordingly, "[t]his burden may be satisfied by the actual production of the arbitration agreement." *Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 222 (S.D.N.Y. 2024) (citation omitted).

"Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show[ ] the agreement to be inapplicable or invalid." *Zachman*, 49 F.4th at 102. This inquiry proceeds in two steps. *Div. 5, LLC v. Fora Fin. Advance LLC*, No. 24 Civ. 6870 (JPO), 2025 WL

1548807, at *2 (S.D.N.Y. May 30, 2025). "First, the court must ask 'whether the court or the arbitrator should be the decision-maker on the question of arbitrability.'" *Id.* (quoting *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 117 (2d Cir. 2025)). "Second, 'if it is for the court to make that determination,' the court must ask 'whether the issues are within the scope of the arbitration agreement and if the agreement is enforceable.'" *Id.* (quoting *Davitashvili*, 131 F.4th at 117).

"In deciding a motion to compel arbitration, the Court applies a 'standard similar to that applicable for a motion for summary judgment.'" *Silver*, 724 F. Supp. 3d at 222 (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). As on a motion for summary judgment, the court therefore "consider[s] all relevant, admissible evidence submitted by the parties and . . . draw[s] all reasonable inferences in favor of the non-moving party.'" *EX.CO Techs. Ltd. v. Empire Media Grp.*, No. 22 Civ. 6383 (MKV), 2023 WL 5035175, at *2 (S.D.N.Y. Aug. 8, 2023) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)). "'Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings.'" *Id.* (quoting *Meyer*, 868 F.3d at 74).[4]

## DISCUSSION

Compass asserts that the Mutual Arbitration Agreement—pursuant to which the parties agreed to arbitrate all legal claims "that may arise out of or be related to

---

[4] Both parties invite the Court to decide the arbitrability issue as a matter of law on the basis of their papers. Neither has sought further development of the evidentiary record.

[Mercedez's] employment, compensation, or termination of employment"—requires Mercedez to arbitrate her claims. (Def. Br. at 15; Bailey Decl. Ex. A). In support, Compass contends that Mercedez's claims of violations of the FLSA, NYLL, and NYCFWL all "clearly arise out of Plaintiff's employment with Defendant, and thus are covered by" the Agreement. (Def. Br. at 15).[5]

Mercedez does not deny that her claims fall within the Agreement's scope. However, as foreshadowed in her Complaint, Mercedez argues that the Agreement is not a valid and enforceable arbitration agreement for two reasons. Mercedez's primary argument is that, under *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 346 F. App'x 602 (2d Cir. 2009), the Agreement is an unlawful "side agreement," impermissibly reached outside the CBA and in violation of the Union's authority as the exclusive bargaining representative of employees at the NYU-Starbucks location. (Pl. Br. at 1-2, 9-11). Mercedez's second argument is that the Agreement was not supported by adequate consideration as it does not provide for a remedy in the case of breach by Compass, and thus is illusory and cannot bind either party. (*Id.* at 11-14).

Compass argues that questions concerning whether the Agreement is enforceable must be presented to the arbitrator, rather than the court, due to the

---

[5] "The Second Circuit has held that nothing in the FLSA evinces an intent from Congress to exempt claims brought under it from the broad policies of the FAA." *Reyes v. Gracefully, Inc.*, No. 17 Civ. 9328 (VEC), 2018 WL 2209486, at *7 (S.D.N.Y. May 11, 2018). Thus, "it is well-established that FLSA claims are arbitrable," and "the Second Circuit and courts in this District repeatedly have found FLSA claims to be arbitrable." *Martinez v. GAB.K, LLC*, 741 F. Supp. 3d 26, 36 (S.D.N.Y. 2024); *see also Hernandez v. RNC Indus., LLC*, No. 21 Civ. 4518 (JS) (ST), 2024 WL 964932, at *5 (E.D.N.Y. Mar. 6, 2024) ("[I]t is well-settled that FLSA and NYLL claims are arbitrable.").

Delegation Clause.  (Def. Br. at 6; Reply at 1-4).  Compass further argues that, even if that is not the case, the Agreement is permissible under the CBA for several reasons.  (Def. Br. at 6-13; Reply at 4-9).  In addition, Compass argues that the Agreement is supported by adequate consideration because both parties are mutually obligated to arbitrate any claims one may have against the other.  (Def. Br. at 13-15; Reply at 9-11).

The Court first takes up Mercedez's argument that the Agreement lacks consideration and is illusory, and then addresses Mercedez's challenge to the enforceability of the Agreement under *Mendez*.

### A.   Whether the Agreement Was Supported by Adequate Consideration

Under ordinary principles of contract law, consideration is necessary in order for a valid contract to be formed.  *See, e.g.*, *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 252 (2d Cir. 2019) (describing "consideration as a necessary element of contract formation" under the "standard formulation of contract formation").  "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  *Rensselaer Polytechnic Inst. v. Varian, Inc.*, 340 F. App'x 747, 749 (2d Cir. 2009) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)); *see also Lehrman v. Lovo, Inc.*, 790 F. Supp. 3d 348, 359 (S.D.N.Y. 2025).  Therefore, "whether a purported promise to arbitrate was supported by consideration must be resolved by the court."  *Alemayehu*, 934 F.3d at 252.

"Consideration exists if 'something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him.'" *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 500 (S.D.N.Y. 2022) (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545, 27 N.E. 256 (1891)) (additional internal quote omitted). "'It is hornbook law that a contract which does not require performance by each party is unenforceable for lack of consideration.'" *Id.* (quoting *Baker's Aid v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1219 (E.D.N.Y. 1990)). However, "courts do not inquire into the adequacy of consideration;" as "long as a contract provides some consideration, . . . even a peppercorn," it is enough in the eyes of the law. *AP Links, LLC v. Glob. Golf, Inc.*, No. 08 Civ. 3602 (TCP) (AKT), 2010 WL 11629613, at *6 (E.D.N.Y. Oct. 4, 2010) (quoting *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 709 (2d Cir. 2004)) (internal quotations omitted).

Plaintiff faces an uphill battle on this point. As its name suggests, the Mutual Arbitration Agreement contains mutual promises to arbitrate: Mercedez agrees to arbitrate her claims against Compass, and Compass agrees to arbitrate its claims against Mercedez. (Bailey Decl. Ex. A). Mercedez protests that such mutuality is the "only" consideration for the Agreement. (Pl. Br. at 14). But as Defendant points out (Def. Br. at 13), nothing more is required: Second Circuit courts have long held that a mutual agreement to arbitrate is itself sufficient consideration for a valid arbitration agreement. *See, e.g.*, *Marciano v. DCH Auto Grp.*, 14 F. Supp. 3d 322, 337 (S.D.N.Y. 2014) ("Even if Plaintiff was correct that

14

Defendants did not promise to hire or to consider hiring her in exchange for signing the Arbitration Agreement, the Agreement by itself contains sufficient consideration because, as discussed, it mutually binds both parties to submit claims exclusively to arbitration." (citing *Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 372 F.2d 753, 758 (2d Cir. 1967))); *Meyer v. Starwood Hotels & Resorts Worldwide, Inc.,* No. 00 Civ. 8339 (JSR), 2001 WL 396447, at *1 (S.D.N.Y. Apr. 18, 2001) ("[In] a contract to arbitrate disputes respecting employment, . . . the mutually binding nature of the arbitration clause constitutes valid consideration.").

Plaintiff does not dispute this. Instead, she presents a different argument under the label of "consideration." Mercedez argues that Compass could refuse to pay for arbitration, contrary to the express language of the Agreement, which would leave her "with no remedy in the event of Defendant's breach." (Pl. Br. at 11). Mercedez argues that because courts have not historically awarded remedies for such refusals to pay arbitration fees, she would be without a remedy, and a contract with no remedy for breach is not enforceable under law. "Without a potential remedy in the event of Defendant's breach (by refusing to arbitrate by not paying arbitration fees), th[e] material consideration [of mutuality] [i]s illusory." (*Id.* at 14).

In support of this argument, Mercedez cites to other cases brought by her counsel—none of which involved Compass—in which employers sought arbitration before the AAA and then failed to pay arbitration fees. The plaintiffs in those cases, Mercedez states, obtained no remedy other than to pursue their claim in court. (Pl.

15

Br. at 13-14).  Mercedez also cites to *ASESD, LLC v. Vanguard Construction &*

*Development Co.*, 79 A.D.3d 418, 910 N.Y.S.2d 907 (1st Dep't. 2010), as another

example of a case in which the employer failed to pay its share of the arbitration

fees.  The court there held that, "[a]s the AAA's rules provide that the remedy for a

party's refusal to pay its share of arbitration fees is for the [employee] to advance

the [employer]'s share of the fees, that is petitioner's recourse here.  This Court

cannot fashion another remedy."  *Id.* at 418.

Mercedez's argument fails for several reasons.  For one, in contrast to the

arbitration agreement in *ASESD* and the other examples provided, the Agreement

here does not provide for arbitration before the AAA or require the parties to abide

by the rules of the AAA or any other arbitral organization.  What's more, the

Agreement expressly excludes from the scope of its mandatory arbitration provision

claims "to enforce this Agreement."  (Bailey Decl. Ex. A).  A claim seeking to require

Compass to pay the arbitration costs it agreed to pay under the Agreement would be

an action to enforce the Agreement.  Thus, it appears Mercedez could pursue a

judicial remedy to enforce Compass's obligation to pay the costs of arbitration.[6]

---

[6] This is true despite the Second Circuit's decision last year in *Frazier v. X Corp.*, 155 F.4th 87 (2d Cir. 2025).  In *Frazier*, the Second Circuit reversed a district court ruling requiring the defendant-employer to pay arbitration fees that it had refused to pay.  The court found that the issue of whether the employer was required to pay the fees, which the employer disputed, was an issue that itself needed to be resolved by the arbitrator or arbitral body rather than by the court.  *Id.* at 97-100. However, the arbitration agreement in *Frazier* was different from the Agreement here in three important respects.  First, the agreement in *Frazier* specified that arbitration would take place through a designated arbitral forum, the Judicial Arbitration and Mediation Services ("JAMS"), pursuant to JAMS's then-current rules, which included provisions regarding payment of fees.  *Id.* at 91.  Here, as discussed, the Agreement contains no such provision.  Second, the agreement in *Frazier* further specified that "any disputes [over arbitration fees] w[ould] be resolved by the Arbitrator," *id.* at 92 (quoting agreement)—another provision absent from the Agreement here.  Third, the agreement in *Frazier* did not contain a carve-out allowing for claims "to enforce this Agreement" to be brought in court rather than in arbitration.  (Bailey Decl. Ex. A).

Even if that were not the case, *ASESD* does not support Mercedez's argument that she would be without a remedy should Compass refuse to pay its contractually agreed-upon arbitration fees. Rather, the case shows that Mercedez *would* have a remedy: she could advance the fees herself, thereby allowing the arbitration to proceed, and recover them against Compass as part of any arbitration award. *See Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 622 (7th Cir. 2024) ("[T]he [plaintiffs] were not left without recourse. They could have advanced [defendant's] fees and continued with arbitration, or they can now pursue their claims on the merits in district court."). Thus, Mercedez would be able to enforce Compass's promise to arbitrate and Compass would not, contrary to Mercedez's claim, be "'free to perform [its promise] or not, as [it] wills.'" (Pl. Br. at 11 (quoting *Marciano*, 14 F. Supp. 3d at 325)).

Mercedez protests that such a result would be unfair, as "the cost of arbitration will always dwarf [a low wage worker's] ability to pay" and that she, "along with her coworkers, cannot afford to pay tens of thousands of dollars to an arbitrator." (Pl. Br. at 12). But as another court in this District has held, this

---

Taken together, these differences make clear that, at least in the scenario Plaintiff envisions, where Compass refused to pay arbitration fees in clear breach of its obligations under the Agreement, *Frazier* would not bar Mercedez from seeking a court order to "enforce th[e] Agreement" through the payment of arbitral fees. Such a claim would not be brought under 9 U.S.C. § 4, like the claim in *Frazier*, but would be brought as a claim for breach of the Agreement. That is the express kind of carve-out *Frazier* noted did not exist in that case, where "nothing in the [arbitration agreements] suggest[ed] that the parties agreed to invoke judicial oversight over [arbitral] decisions or procedures," and "much to the contrary, the [arbitration agreements] explicitly with[held] fee disputes from [court] review." 155 F.4th at 100. Given the language of the Agreement, judicial enforcement of Compass's promise to pay fees would, in fact, better comport with the principle, emphasized in *Frazier*, that courts must "'rigorously enforce arbitration agreements according to their terms.'" *Id.* at 96 (quoting *Cedeno v. Sasson*, 100 F.4th 386, 394-95 (2d Cir. 2024)).

17

argument, while "styled in the language of 'consideration,'" does not truly "pertain[]" to consideration in the sense of contract formation"; rather, it is "better understood as alleging a species of unconscionability." *McCrae v. Oak St. Health, Inc.*, No. 24 Civ. 1670 (JPO), 2025 WL 415389, at *4-5 (S.D.N.Y. Feb. 6, 2025) (rejecting same argument made by Mercedez's counsel). Mercedez's brief in effect acknowledges as much, concluding her argument as to "consideration" by urging that the Arbitration Agreement "be rejected as unconscionable by the Court." (Pl. Br. at 15).

Finally, the Court notes that Mercedez's argument is entirely theoretical. While claiming that employers sometimes breach their obligation to pay arbitration costs (*id.* at 13-14), Mercedez does not cite a single instance in which Compass has committed such a breach. Nor does she provide any other reason to suggest that Compass would violate its contractual obligation to pay the arbitration costs if this case were sent to arbitration. Mercedez cites several cases finding an arbitration agreement to be unenforceable for want of consideration where the agreement itself imposed no obligation upon the employer to arbitrate, or allowed the employer unilaterally to opt out of arbitration. (*Id.* at 14). But those cases are inapposite here, as the Agreement indisputably does impose upon Compass a binding legal obligation to arbitrate. Mercedez cites no case finding such an arbitration agreement to lack consideration based on the theoretical possibility that a party might choose to *breach* its obligations under the agreement.

Accordingly, Mercedez's argument that the Agreement is illusory or void for lack of consideration must be rejected.

**B.      Whether the Agreement Is an Unlawful "Side Agreement" Under *Mendez v. Starwood Hotels***

Mercedez's argument that the Agreement is void and unenforceable as an unlawful "side agreement" to the CBA, under the authority of the Second Circuit's decision in *Mendez*, has greater merit.

In *Mendez*, the defendant-employer moved to compel arbitration of its former employee's discrimination claims on the basis of an arbitration provision in a letter agreement signed by the plaintiff.  The plaintiff, a member of a union, argued that the agreement was void and unenforceable by virtue of the union's collective bargaining agreement with the employer, which he contended barred him and his employer from entering into a separate agreement relating to the terms and conditions of his employment.  *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 08 Civ. 4967 (CM) (KNF), 2008 WL 2945346, at *1 (S.D.N.Y. July 29, 2008).  The district court agreed, declaring the agreement to be an unenforceable "side agreement," and denied the motion to compel arbitration.  *Id.* at *1-2.

The Second Circuit, in a summary order, affirmed.  *Mendez*, 346 F. App'x at 602-03.  Under the NLRA, the union is the "exclusive representative[]" to bargain over employees' "rates of pay, wages, hours of employment, and other conditions of employment," 29 U.S.C. § 159(a), and as a result "only the union may contract the employee's terms and conditions of employment," *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967).  Applying those precepts, the Second Circuit held that the arbitration provision intruded upon "subjects that are within the union's exclusive bargaining realm" and "is therefore unenforceable."  *Mendez,* 346 F. App'x at 603.

19

Mercedez argues that *Mendez* is controlling here.  (Pl. Br. at 1-2).[7]  Compass disagrees.  (Def. Br. at 6-13).  But it argues as an initial matter that, in light of the Agreement's Delegation Clause, it is the arbitrator, not the court, that must decide Mercedez's challenge to the Agreement under *Mendez*.  (*Id.* at 6; Reply at 1-4).  The Delegation Clause requires that questions relating to, *inter alia*, the "enforceability" of the Agreement be arbitrated (Bailey Decl. Ex. A), and Compass characterizes Mercedez's *Mendez*-based challenge as "one of enforceability."  (Reply at 1).  Mercedez counters that the question of whether the Agreement was barred by the CBA is "one of contract formation" which must be decided by the court.  (Pl. Br. at 2).  The Court first addresses this issue of "whether the court or the arbitrator should be the decision-maker on the question of arbitrability."  *Davitashvili*, 131 F.4th at 117.

### 1.    Arbitrability of Plaintiff's *Mendez* Challenge

At the outset, the Court notes that the defendant-employer in *Mendez* also argued in the district court that the question of whether the arbitration agreement was void under the CBA "must be submitted to an arbitrator."  *Mendez*, 2008 WL 2945346, at *1.  Nonetheless, Judge McMahon resolved the question herself.  *See id.*

---

[7] Of course, since *Mendez* is a summary order, it does not constitute binding precedent.  *See* 2d Cir. R. 32.1.1 (precedential effect of summary orders) ("Rulings by summary order do not have precedential effect.").  But courts "'are, of course, permitted to consider summary orders for their persuasive value, and often draw guidance from them in later cases.'"  *Force v. Facebook, Inc.*, 934 F.3d 53, 66 n.21 (2d Cir. 2019) (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 450 n.5 (2d Cir. 2012)); *see also Anwar v. Fairfield Greenwich Ltd.*, 884 F. Supp. 2d 92, 97 (S.D.N.Y. 2012) (noting that summary orders are "persuasive authority to the extent that their factual patterns align with the instant case and their reasoning is compelling").  While Compass argues that *Mendez* is distinguishable, it does not argue that *Mendez* was wrongly decided or should not be followed.

at *1-2.  In another case involving a *Mendez*-based challenge to an arbitration agreement, the defendant-employer likewise argued that the arbitrator should decide the merits of the plaintiff's challenge.  *See Hedges v. United Parcel Serv. of Am., Inc.*, No. 20 Civ. 870 (BMC) (E.D.N.Y.), Dkt. No. 19 at 8-9.  There, too, the district court nonetheless proceeded to decide the question itself (concluding, under the facts of that case, that the arbitration agreement was not barred).  *See Hedges v. United Parcel Serv. of Am., Inc.*, No. 20 Civ. 870 (BMC), 2020 WL 4481657, at *3-5 (E.D.N.Y. Aug. 4, 2020).  Thus, in the only two cases on point, the issue of whether an arbitration agreement was permissible under a CBA was decided by the court.[8]

Compass argues that this case is different because the Mutual Arbitration Agreement contains a delegation clause.  (Tr. at 6:1-18, 12:7-12; *see* Def. Br. at 6; Def. Supp. Ltr. at 2-3).  However, if Mercedez is correct that her *Mendez* challenge presents an issue of contract formation, the Delegation Clause would not prevent this Court from deciding it.  "[I]t is 'well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.'"  *Perry St. Software, Inc. v. Jedi Techs., Inc.*, No. 20 Civ. 4539 (CM), 2020 WL 6064158, at *5 (S.D.N.Y. Oct. 14, 2020) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)).  This is true "even where a delegation clause exists." *Alemayehu*, 934 F.3d at 251 (citation omitted).  That is because "parties may not

---

[8] The parties have not cited, and the Court has not found, any judicial decisions other than *Mendez* and *Hedges* that consider an argument that an arbitration agreement was unenforceable as an infringement on a union's exclusive bargaining authority.

delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Id.*[9]

Mercedez's contract formation argument relies on Second Circuit law holding that "[i]f an agent that has been charged with negotiating a contract on behalf of the principal acts outside the scope of its agency, and the opposing party knows this, then the agent lacks both actual and apparent authority, and the principal is not bound to the contract, for the contract is void—it never came into legal existence." *Sphere Drake Ins., Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001); *see Doyle v. UBS Fin. Servs.*, No. 22 Civ. 276 (FPG), 2024 WL 1146620, at *5-6 (W.D.N.Y. Feb. 23, 2024) (applying *Sphere Drake* and denying motion to compel arbitration because plaintiffs had raised a genuine dispute of material fact as to the signatory's "authority to execute the Agreement" on behalf of the party to be bound). (*See* Pl. Br. at 1-3).  Mercedez argues that, because of the CBA and the NLRA, she and Compass had no authority to enter into the Agreement, and thus, the Agreement is "void."  (Pl. Supp. Ltr. at 2).

As Compass points out, however, Mercedez's claim is unlike the lack-of-authority claims in the cases she cites, which involve principal-agent relationships. (Reply at 3 & n.2; Tr. at 15:5-22).  In those cases, the party who signed the contract (the agent) was not the same party purportedly bound by the contract (the principal), and the principal claimed he or she never authorized the agent to sign the contract on the principal's behalf.  Courts recognize that such claims involve a

_____

[9] At oral argument, Compass acknowledged as much.  (*See* Tr. at 4:13-15 (acknowledging that "an issue of contract formation would have to be submitted to the court")).

question of contract formation because, in essence, the principal contends that he or she never agreed to enter into the contract, and hence the foundational element of mutual assent is lacking. *See, e.g.*, *Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 238 (4th Cir. 2019) (where the agent "lacks authority to bind his principal . . . to a contract with a third party . . . yet purports to do so anyway, no contract is formed between the principal and the third party"); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2002) (approving this line of authority as "sound, for a person who has not consented (or authorized an agent to do so on his behalf) can't be packed off to a private forum").

Here, by contrast, Mercedez signed the Agreement herself, purporting to bind only herself. No question of whether an "agent" acted outside the scope of the authority granted by his or her "principal" in signing the arbitration agreement is presented. And while Mercedez argues that an unauthorized agent is not the only scenario where "an individual might lack authority to enter a contract" (Pl. Supp. Ltr. at 1), she cites no cases outside that scenario holding that a lack of authority constitutes a question of contract formation. Nor does she explain which of, or how, the elements of contract formation under New York law—"offer, acceptance, consideration, mutual assent and intent to be bound," *Rensselaer Polytechnic Inst.*, 340 F. App'x at 749—are not satisfied in this case.

Instead, Mercedez argues that she lacked authorization to enter into the Agreement "by pure operation of law," because under the NLRA, "a union member lacks the legal power so make such agreements," and as a result the Agreement had

no "legal existence." (Pl. Supp. Ltr. at 2). In making this argument, Mercedez effectively concedes that she is, in substance, raising a challenge to the *legality* of the Agreement. But the legality of the Agreement is not a question of contract formation. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded."). In other words, Mercedez's challenge goes not to whether an agreement to arbitrate was formed—the issue for the court to decide at the first step of the arbitrability analysis—but to whether that agreement is valid. And "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445-46; *see also Doctor's Assocs., Inc. v. Kirksey*, No. 18 Civ. 963 (JCH), 2018 WL 6061573, at *4 (D. Conn. 2018) (noting that "[t]he Supreme Court has expressly distinguished between the issue of a contract's 'validity'—which can be delegated to the arbitrator through a delegation clause"— "from the issue of a contract's 'formation,' which must be decided by the court" (citations omitted)).

Many claims of contract validity could be rechristened as "contract formation" claims that the parties lacked legal "authority" to "enter into" their agreement, or that their agreement is "void" and thus had no "legal existence." But the strictures of the FAA may not be so easily evaded. The Supreme Court made this clear in *Buckeye Check Cashing*. The plaintiffs in that case argued that "since an agreement void *ab initio* under state law is not a 'contract,'" it was not a "contract"

24

within the meaning of § 2 of the FAA.  546 U.S. at 447.  Squarely rejecting that argument, the Supreme Court found there to be "no doubt" that the term "contract" as used in § 2 "must include contracts that later prove to be void."  *Id.* at 448.  The Court thus held that the plaintiffs' claim that the contract containing the arbitration agreement was "void for illegality" must be decided by the arbitrator, not the court.  *Id.* at 442, 449.

Accordingly, the Court concludes that Mercedez's *Mendez* challenge is a challenge to the lawfulness of the Agreement under the NLRA and does not present a genuine issue of contract formation.  *See Inventory Generation Inc. v. Proventure Corp. Funding LLC*, No. 22 Civ. 10529 (PAE), 2023 WL 2609344, at *6-7 (S.D.N.Y. Mar. 23, 2023) (compelling arbitration pursuant to arbitration clause despite plaintiff's contention that agreements were "illegal" under New York usury statute and hence "void *ab initio*" and "void as a matter of law," as "those challenges are properly resolved by the arbitrator in the first instance"); *Rubin v. Sona Int'l Corp.*, 457 F. Supp. 2d 191, 196 (S.D.N.Y. 2006) (compelling arbitration despite plaintiff's claim that because defendant's "offer to sell the franchise was unlawful, the entire Agreement was void *ab initio*," as that claim must go to the arbitrator); *AllCity Fam. Healthcare Ctr., Inc. v. Boss Surgical Grp., LLC*, No. 12 Civ. 6428 (NGG) (JMA), 2014 WL 13000636, at *9 (E.D.N.Y. Aug. 13, 2014) ("To the extent that Plaintiff argues that the contract is void under public policy due to its choice-of-law-provisions, this argument too should go before the arbitrator."); *see also Huynh v. Boom Shakalaka, Inc.*, No. 2:25-cv-8121-HDV-SK, 2026 WL 247880, at *1 (C.D. Cal.

25

Jan. 28, 2026) ("Plaintiff's challenge to the legality of the contract raises a question of contractual enforceability—not one of contract formation—and as such must be reviewed by the arbitrator given the otherwise valid arbitration and delegation provision."); *Ferrandino & Son Inc. v. WMG Dev. LLC*, No. 6:23-CV-679, 2023 WL 3985520, at \*3-4 (W.D. La. June 13, 2023) (rejecting plaintiff's argument that, because he did not have an active contractor's license, the construction contract containing the arbitration provision was illegal and thus was never "formed"; plaintiff "cannot avoid" Supreme Court precedent "by merely re-framing a legality challenge to the [contract] as a formation question under Louisiana law").

The Court's rejection of Mercedez's contract formation argument, however, does not end the analysis. "There are two types of validity challenges" under the FAA: "'[o]ne type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole[.]'" *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010) (quoting *Buckeye Check Cashing,* 546 U.S. at 444). The latter type, typically mounted when the arbitration agreement is part of a broader contract unrelated to arbitration, is generally for the arbitrator to decide. *Id.* at 71-72. But the former is typically for the court to decide. "If the challenge is to 'the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it.'" *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 61 (2d Cir. 2012) (quoting *Buckeye Check Cashing,* 546 U.S. at 445); *see also Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) ("'If a party challenges the validity . . . of the precise agreement to arbitrate at

issue, the federal court *must* consider the challenge before ordering compliance with that [arbitration] agreement.'" (quoting *Rent-A-Center*, 561 U.S. at 71)) (emphasis in original).

Mercedez's challenge is of this nature. It is directed at the Mutual Arbitration Agreement, not at some broader agreement of which an arbitration clause is merely one provision. Moreover, the challenge is specifically based on *Mendez*'s holding that employees and employers cannot enter into "agreements to arbitrate" that intrude upon a union's exclusive bargaining authority. *See Mendez*, 346 F. App'x at 603. Mercedez therefore challenges "specifically the validity of the agreement to arbitrate," *Rent-A-Center*, 561 U.S. at 70 (internal quotation omitted), and her argument "goes to the making of the agreement to arbitrate," *Buckeye Check Cashing*, 546 U.S. at 445. If the Agreement had no delegation clause, there would be no doubt that the court, rather than the arbitrator, would decide the merits of Mercedez's *Mendez* argument, just as the court in *Mendez* did.

The question thus becomes whether the Delegation Clause changes the analysis. "Parties to an arbitration agreement can, of course, 'agree to arbitrate "gateway" questions of "arbitrability."'" *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (quoting *Rent-A-Center*, 561 U.S. at 68-69). "A delegation provision contained in an agreement to arbitrate, which purports to delegate the resolution of certain questions to the arbitrator, rather than the district court, must be enforced in the same way as any other contract provision." *Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 602 (S.D.N.Y. 2020). Such a provision is

deemed severable from the agreement to arbitrate itself, and therefore, "unless [the party resisting arbitration] challenge[s] the delegation provision specifically," the court must enforce it, "leaving any challenge to the validity of the Agreement as a whole to the Arbitrator." *Rent-A-Center*, 561 U.S. at 72.

Importantly, however, "this rule does not require that a party challenge *only* the arbitration or delegation provision. Rather, where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge." *Coinbase*, 602 U.S. at 151 (quoting *Rent-A-Center*, 561 U.S. at 71) (emphasis in original); *see also Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 294 (4th Cir. 2020) ("'[I]n specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." (quoting *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226-27 (3d Cir. 2018)); *Billboard Media, LLC v. Wray*, No. 23 Civ. 7809 (AT) (SLC), 2024 WL 4299048, at *2 (S.D.N.Y. Sept. 25, 2024) ("[A] court will consider whether an arbitration agreement's [alleged infirmity] '*as applied* to the delegation provision render[s] *that provision* [infirm].'" (quoting *Rent-A-Center*, 561 U.S. at 74)) (emphasis in original).

Here, Mercedez's challenge applies equally to the Agreement and the Delegation Clause. As noted, Mercedez argues that, under the NLRA and *Mendez*, she (and Compass) lacked authority to enter into "agreements to arbitrate" given the CBA and the NLRA. A delegation clause *is* an agreement to arbitrate—in particular, as it is often called, "an agreement to arbitrate arbitrability." *Davis v.*

*TMC Rest. of Charlotte, LLC*, 854 F. App'x 518, 519 (4th Cir. 2021); *Galvez v. JetSmarter, Inc.*, No. 18 Civ. 10311 (VSB), 2019 WL 4805431, at \*6 (S.D.N.Y. Sept. 30, 2019); *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 112 (2019) (describing a delegation clause as "merely a specialized type of arbitration agreement"); *Coinbase*, 602 U.S. at 150.  If the parties could not lawfully agree to arbitrate their disputes, it follows that they could not lawfully agree to arbitrate disputes about the arbitrability of their disputes.[10]

This, then, is not a case, like *Rent-A-Center* itself, where the plaintiff's validity challenge to the arbitration agreement in general may or may not apply to the delegation clause.  In *Rent-A-Center*, the plaintiff claimed that the arbitration agreement was unconscionable, but the reasons he provided either "clearly did not go to the validity of the delegation provision" or were not argued to apply to the delegation provision and would have been "much more difficult [ ] to sustain" if applied to the delegation provision.  *Rent-A-Center*, 561 U.S. at 73-74; *see also Davitashvili*, 131 F.4th at 118 (similarly finding that plaintiffs had failed to "show why allowing an arbitrator—as opposed to a court—to decide the question of arbitrability would be unconscionable").  In some cases, as the Supreme Court

---

[10] The Court asked Compass's counsel at oral argument if Mercedez's *Mendez*-based challenge to the Agreement did not apply equally to the Delegation Clause.  While contending that it did not, Compass's counsel could not articulate a plausible reason *why* it did not, emphasizing instead that Mercedez had voluntarily agreed to the Delegation Clause, the case law generally enforcing such agreements, and the fact that Mercedez (unlike the plaintiff in *Mendez*) was not a current employee when she signed the Agreement.  (Tr. at 14:17-19:8).  None of these circumstances is a basis for treating Mercedez's challenge differently as applied to the Delegation Clause.  Compass's supplemental letter brief submitted after oral argument, while continuing to urge enforcement of the Delegation Clause, made no attempt to argue that Mercedez's *Mendez*-based challenge does not apply equally to the Delegation Clause.  (*See* Def. Supp. Ltr. at 1-3).

recognized in *Coinbase*, a challenge to the enforceability of the agreement will, by its nature, apply equally to a delegation clause. This is such a case. *See Melendez v. Ethical Culture Fieldston Sch.*, 789 F. Supp. 3d 316, 329 n.5 (S.D.N.Y. 2025) (considering whether contract with minor was enforceable, despite delegation clause, because "the delegation clause likewise may be enforced only once the Court is satisfied that the contract containing it is valid") (citing *Coinbase*, 602 U.S. at 151).

Compass nonetheless insists that the Delegation Clause must be enforced because "Plaintiff makes *absolutely no specific attack* on the delegation clause," and Mercedez's "sole argument is that the delegation provision is inapplicable because Plaintiff had no authority to enter into the Arbitration Agreement as a whole." (Def. Supp. Ltr. at 2) (emphasis in original). The Court disagrees. Plaintiff's Complaint alleged that "any" agreement to arbitrate that Compass might rely on would be unenforceable under *Mendez*. (Compl. ¶¶ 20-21, 100). And Plaintiff's opposition brief argued that the parties could not "delegate[] arbitrability issues to the arbitrator" in light of her argument that the Union retained exclusive authority "to negotiate over arbitration terms." (Pl. Br. at 2-3).[11] *See Minnieland Priv. Day School, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 455 (4th Cir. 2017) (plaintiff's claim that state statute rendered void "any" arbitration provision in relevant contract "necessarily includ[ed] the delegation provision");

---

[11] Although Plaintiff's brief characterized Plaintiff's lack-of-authority argument as a contract formation challenge rather than a validity challenge, and the Court has rejected that characterization, the substance of the argument is the same, and encompasses the Delegation Clause.

*Devine v. Bethesda Softworks, LLC*, 636 F. Supp. 3d 564, 571 (D. Md. 2022) (where plaintiff argued that he lacked capacity as a minor to contract, that argument "necessarily include[d] the delegation clause" and "sufficiently challenged the delegation provision").

In any event, at oral argument, Plaintiff's counsel specifically clarified that, if construed as going to the validity of the Agreement rather than its formation, her *Mendez* challenge is also aimed at the Delegation Clause, and for the "same reasons." (*See* Tr. at 46:9-25, 47:12-48:7). Compass argues that this is not good enough because Mercedez "still did not raise any argument *specific* to the delegation clause *itself.*" (Def. Supp. Ltr. at 2 n.1 (emphasis in original)). But Compass is incorrect. Courts in this Circuit and elsewhere have found that a plaintiff may challenge a delegation clause "on the same bases from which it challenges other aspects of the arbitration agreement." *Kelly-Starkebaum v. Papaya Gaming Ltd.*, No. 24 Civ. 2310 (DLC), 2024 WL 5135799, at *8 (S.D.N.Y. Dec. 17, 2024) (citing *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009-10 (9th Cir. 2023)); *see Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 55 (E.D.N.Y. 2017) ("[T]o the extent that [p]laintiffs argue that the delegation clause itself is unconscionable for the same reasons that the Services Agreements or arbitration provisions as a whole are unconscionable, the Court considers those arguments as applied to the delegation clause.") (internal citation omitted); *Silva v. Schmidt Baking Distribution, LLC*, 732 F. Supp. 3d 194, 212 n.8 (D. Conn. 2024) ("Though this argument applies to the contract as a whole, '[a] party may contest the enforceability of the delegation clause

with the same arguments it employs to contest the enforceability of the overall arbitration agreement.'" (quoting *Hengle v. Treppa*, 19 F.4th 324, 335 (4th Cir. 2021)), *vacated and remanded on other grounds*, 162 F.4th 354 (2d Cir. 2025); *see also Gibbs*, 966 F.3d at 291 ("[C]ourts have construed a party's argument that the 'delegation clause suffers from the same defect as the arbitration provision' to be a sufficient challenge to the delegation provision itself." (quoting *MacDonald*, 883 F.3d at 226-27)); *Ode v. Anheuser-Busch, LLC*, No.: 4-19-cv-233-WMR, 2020 WL 5405666, at *4-5 (N.D. Ga. Aug. 19, 2020) (finding that plaintiffs' statement that "because the DRP does not bind Plaintiffs, the delegation clause has no application either" was a sufficiently specific challenge to the delegation clause and rejecting defendant's argument that it was insufficient "because it is the same argument used against the DRP as a whole").[12]

Accordingly, the Court now considers the question of whether the Agreement is an unenforceable "side agreement" under *Mendez*.

---

[12] Compass also asserts that Mercedez "cannot rely on any belated attempt to raise th[is] issue for the first time in oral argument." (Def. Supp. Ltr. at 2 n.1). But it cites no authority for that proposition, and it is well settled that courts have the discretion to consider arguments raised at oral argument, especially where, as here, it is in the nature of clarifying or making explicit what was set forth in the party's brief rather than an entirely new argument. *See, e.g.*, *Fernandez v. UBS AG*, No. 15 Civ. 2859 (SHS), 2018 WL 4440498, at *9 n.12 (S.D.N.Y. Sept. 17, 2018) (considering points raised for the first time at oral argument, "even though they were not explicitly set forth in the briefing," because they were "essentially subparts" of issue raised in the party's brief). Moreover, Compass was given a full opportunity to address the question not only at oral argument, but also in its post-argument supplemental letter brief. (Tr. at 61:5-9 (inviting parties to provide supplemental briefing on anything "that came up, really, for the first time today")). *See US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS), 2015 WL 997699, at *3 (S.D.N.Y. Mar. 5, 2015) (recognizing unfairness of considering new theory presented at oral argument where other party had "no opportunity to brief its opposition"). Accordingly, Compass faces no prejudice through consideration of this argument now, even if it were new (which it is not). Moreover, the Court has considered arguments made by Compass for the first time at oral argument, such as the NLRB's alleged interpretation of the term "work rules," discussed *infra*.

**2.    Validity of the Agreement Under *Mendez***

Mercedez argues that here, as in *Mendez*, she was a member of the Union; the Union had the exclusive right under § 159(a) of the NLRA to bargain over the terms and conditions of her employment; arbitration agreements are a term and condition of employment; and the Mutual Arbitration Agreement thus intrudes upon the Union's exclusive authority.  (Pl. Br. at 1; Compl. ¶¶ 17-21).  Accordingly, Mercedez contends, the Agreement is, as was the arbitration agreement in *Mendez*, an unlawful and unenforceable "side agreement" and cannot compel arbitration. (Pl. Br. at 1; Compl ¶¶ 17-21).

Compass does not dispute the essential legal underpinnings of Mercedez's argument.  Instead, Compass argues that *Mendez* is distinguishable because: (1) a "Management Rights" clause in the CBA allowed Compass to enter into the Mutual Arbitration Agreement with Mercedez and other employees; and (2) unlike the plaintiff in *Mendez*, Mercedez was not an employee or a member of the Union at the time she signed the Agreement or at the time she filed this lawsuit.  (Def. Br. at 7-13; Reply at 4-9).  The Court considers each of Compass's arguments in turn.

**a.    Management Rights Clause**

Article 7 of the CBA, titled "Management Rights," clause, retains Compass's rights over:

> The management of the business and the direction of the employees including but not limited to, the right to hire, promote, assign work, discipline and discharge, schedule working hours, overtime and working days, layoff for lack of work, make and enforce reasonable work rules except as expressly limited and set forth in writing in this Agreement.

33

(Rosario Decl. Ex. A Article 7 (the "Management Rights Clause")).  *See Alaris Health at Boulevard E. v. NLRB*, 123 F.4th 107, 114 n.3 (3d Cir. 2024) ("A management rights clause is a 'contractual provision that authorizes an employer to act unilaterally, in its discretion, with respect to a mandatory subject of bargaining.'" (quoting *E.I. Dupont De Nemours, Louisville Works*, 355 NLRB 1984, 1085 (2010))).

In its opening and reply briefs, Compass argued that the phrase "management of the business and the direction of the employees," by its "plain terms[,] . . . gives Defendant complete discretion over the direction of the employees, unless the CBA otherwise expressly limits those rights."  (Def. Br. at 12; Reply at 9). As the CBA does not expressly limit Compass's ability to enter into arbitration agreements with individual employees, Compass argues that the Agreement does not conflict with the CBA, and is permissible "given the breadth of the Management Rights clause."  (Reply at 9; *see* Def. Br. at 12).  During oral argument and in its supplemental letter brief, Compass shifted focus, emphasizing instead the phrase "make and enforce reasonable work rules" that appears within the "including but not limited to" clause.  According to Compass, an arbitration agreement falls within the definition of "work rules" as used in NLRB decisions.  (Tr. at 24:7-26:9; Def. Supp. Ltr. at 3-4).

Compass notes that the CBA in *Mendez* also had a "Management Rights" clause, which "only" gave the employer rights "to direct and control its employees." (Def. Br. at 12; *see* Kaufman Decl. Ex. C).  Compass describes this as "a far cry from

34

the employer-friendly Management Rights clause in the CBA here." (Def. Br. at 12). Further, Compass relies on *Hedges*, which upheld a side agreement requiring the plaintiff to arbitrate his claims on the basis of a provision in the CBA "unequivocally permitting [defendant] to enter into 'Extra Contract Agreements' with its employees . . ., so long as these side agreements did not conflict with the CBA." *Hedges*, 2020 WL 4481657, at *3. The *Hedges* court found that through this provision the union "clearly and unmistakably waived its right to collectively bargain and negotiate over the arbitrability of an individual employee's statutory claims[.]" *Id.* at *4. (*See* Def. Br. at 13; Reply at 5).

Mercedez argues, *inter alia*, that the Management Rights Clause only pertains to issues concerning the "day-to-day management of the business" (to the extent not addressed in the CBA), that "the only reasonable interpretation of a general term like 'work rules' is the day-to-day rules, decisions, and protocols of the workplace," that contrasting language in the relevant CBAs distinguishes this case from *Hedges*, and that, at the very least, the Management Rights Clause does not evince a "clear and unmistakable" waiver of the Union's right to negotiate the terms of any arbitration agreement. (Pl. Br. at 9-11; Pl. Supp. Ltr. at 3).

Before determining whether the Union here waived its right to bargain over the arbitrability of an individual employee's claims, the Court first examines the proper framework for evaluating such a waiver claim. The answer to this question has recently been in flux at the NLRB and in the courts.

35

Beginning in at least 1949, the NLRB expressed "reluctan[ce] to deprive employees of any of the rights guaranteed them by the [NLRA] in the absence of a clear and unmistakable showing of a waiver of such rights." *Tide Water Associated Oil Co. (Bayonne, N.J.)*, 85 NLRB 1096, 1098 (1949). Accordingly, on multiple instances, the Board determined it would not find that a union had ceded its right to bargain over mandatory terms of bargaining unless the "clear and unmistakable" standard was met. *See, e.g.*, *Mt. Sinai Hosp.*, 331 NLRB 895, 895 n.2 (2000) (applying "well-settled 'clear and unmistakable' standard"), *enfd.*, 8 F. App'x 111 (2d Cir. 2001); *Provena Hosps., d/b/a Provena St. Joseph Med. Ctr. & Ill. Nurses Ass'n*, 350 NLRB 808, 810-11 (2007) (reaffirming adherence to "one of the oldest and most familiar of Board doctrines" and collecting cases).

In 2019, however, the NLRB changed course. In *MV Transportation, Inc.*, the agency overruled its longstanding precedent and adopted the "contract coverage" standard. 368 NLRB No. 66, at *1 (Sept. 10, 2019). Under this standard, the reviewing administrative or judicial body "examine[s] the plain language of the collective-bargaining agreement to determine whether action taken by an employer was within the compass or scope of contractual language granting the employer the right to act unilaterally." *Id.* at *2. In effect, the Board lowered the bar, relying on "the plain terms of the agreement" and "ordinary principles of contract interpretation" to determine whether an employer's action was allowable under the relevant CBA, rather than requiring a "clear and unmistakable" waiver. *Id.*

36

Just two years after *MV Transportation*, the Second Circuit followed suit.  In 2021, the Second Circuit held that it would "defer to the Board and adopt the contract coverage standard" as the relevant framework.  *Int'l Bhd. of Elec. Workers, Loc. Union 43 v. NLRB*, 9 F.4th 63, 73 (2d Cir. 2021).[13]  The court found, following *MV Transportation*, that the clear and unmistakable waiver standard "tended to undermine contractual stability and alter the bargain reached by parties through negotiations" and "often caused the Board to sit in judgment upon contract terms," problems both obviated by the contract coverage standard.  *Id.* at 72-73.  Moreover, the court noted that the latter framework "harmonizes the Board's interpretive approach with ordinary principles of contract interpretation while preserving meaningful limits on unilateral employer action."  *Id.* at 73.

Following that ruling, however, the NLRB recently switched back to the clear and unmistakable waiver standard.  In *Endurance Env't Sols., LLC*, the Board held that the contract coverage standard "undermines the [NLRA's] central policy of promoting industrial stability by encouraging the practice and procedure of collective bargaining."  373 NLRB No. 141, at *1 (Dec. 10, 2024).  In doing so, the Board found that the courts of appeals that embraced the contract coverage standard, including *Elec. Workers*, failed to address "the Supreme Court's approval

---

[13] Prior to this decision, the Second Circuit had applied the clear and unmistakable standard.  *See, e.g.*, *Loc. Union 36, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB*, 706 F.3d 73, 83-84 (2d Cir. 2013) (setting forth a "two-step framework" that analyzes "whether the issue is clearly and unmistakably resolved (or 'covered') by the contract" and, if not, "whether the union has clearly and unmistakably *waived* its right to bargain") (emphasis in original); *NLRB v. United Techs. Corp.*, 884 F.2d 1569, 1575 (2d Cir. 1989) ("[A] union may waive its statutory right to bargain over a particular term or condition of employment.  Because national labor policy disfavors waivers of statutory rights by unions, the purported waiver must be clear and unmistakable." (cleaned up)).

of the clear and unmistakable waiver standard" in *NLRB v. C & C Plywood Corp.*, 385 U.S. 421 (1967), or "grapple[] with the Court's admonition that the Board's choice of standard was entitled to considerable deference." *Id.* at *13.

Mercedez argues that this Court should follow the most up-to-date precedent from the NLRB and utilize the clear and unmistakable waiver standard. (Pl. Supp. Ltr. at 3). Yet Mercedez does not mention the Second Circuit's adoption of the contract coverage standard in *Elec. Workers*, let alone explain why the Court should not follow it. Compass, meanwhile, argues that *Elec. Workers* should apply. (Def. Supp. Ltr. at 4 n.5). Yet *Elec. Workers* made clear that in adopting the contract coverage standard, it was "defer[ring] to the Board," 9 F.4th at 73, and Compass does not explain why sticking with that standard after the NLRB renounced it would be consistent with *Elec. Workers.* Nor does either party discuss how the analysis may be impacted by the Supreme Court's recent decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), which overruled *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), upon which *Elec. Workers* relied in deferring to the NLRB's 2019 interpretation, *see* 9 F.4th at 71 n.27, 73.

The Court has found no other decisions in this Circuit considering the applicable standard post-*Elec. Workers* in 2021, let alone post-*Endurance Env't* in 2024. Fortunately, however, the Court need not enter this thicket. That is because, whether analyzed under the clear and unmistakable standard or the more lenient contract coverage standard, the Agreement is not authorized by the Management Rights Clause.

The Court begins with the text of the Management Rights Clause. *See Elec. Workers*, 9 F.4th at 72 ("[T]he contract coverage standard asks only that we 'examine the plain language of the collective-bargaining agreement to determine whether action taken by an employer was within the compass or scope of contractual language granting the employer the right to act unilaterally.'" (quoting *MV Transp. Inc.*, 368 NLRB No. 66, at \*2)).  To fall within the plain meaning of the clause, the Mutual Arbitration Agreement must be a part of Compass's "management of the business" or "direction of the employees."  As for the first part of this language, Compass makes no real attempt to claim that obtaining arbitration agreements from individual employees is part of the "management of the business."  (*See* Def. Br. at 12 (invoking the "direction of the employees" language but not "management of the business"); Tr. at 24:24-25:2 (same)).

As for "direction of the employees," the plain meaning of that phrase suggests directing employees in the performance of their work duties.  Similar language in the Federal Labor Management Relations Act ("LMRA"), which regulates collective bargaining between federal agencies and unions, has been construed in precisely this manner.  Specifically, the LMRA exempts certain "management rights" from the duty to bargain, including, *inter alia*, the right to "direct . . . employees."  5 U.S.C. § 7106(a)(2)(A).  The Federal Labor Relations Authority has long "defined the right to 'direct employees' as the right to 'supervise and guide them in the performance of their duties[.]'"  *Nat'l Treasury Emps. Union v. FLRA*, 943 F.3d 486, 492 (D.D.C. 2019) (quoting *Nat'l Treasury Emps. Union* (*Bureau of Public Debt*), 3

39

F.L.R.A. 768, 775 (1980), *aff'd sub nom. Nat'l Treasury Emps. Union v. FLRA* (*NTEU 1982*), 691 F.2d 553 (D.C. Cir. 1982)).

Compass does not, and could not convincingly, argue that the Agreement involves "supervising" or "guiding" its employees "in the performance of their duties." Obtaining arbitration agreements from incoming employees is not such an activity. Rather, the Agreement governs how legal disputes between Compass and the employee will be resolved. That is a process that takes place outside the workplace and does not involve directing employees in how they perform their jobs.

In this respect, the language of the Management Rights Clause parallels that of the management rights clause in *Mendez*, which, as noted, protected the employer's "right to direct and control its employees."[14] Conversely, the language of the CBA in *Hedges* was very different. As noted, the CBA there "explicitly provided [defendant] with the right to enter into extra contract agreements with its employees so long as they were consistent with the CBA." *Hedges*, 2020 WL 4481657, at *4. The CBA also contained a provision in which the parties expressly agreed that "there shall be no demands for collective bargaining negotiations as to any matter or issue not covered by the provisions of this Agreement," except as provided in the CBA. *Id.* at *2. It was on the basis of these "unambiguous provisions" that the *Hedges* court concluded that the union had waived its right to bargain over "matters left unaddressed by the CBA," such as the arbitrability of

---

[14] It does not appear that the employer in *Mendez* even argued that the management rights clause in that case permitted the individual arbitration agreement. (*See Mendez*, No. 08 Civ. 4967, Dkt. Nos. 9 & 16).

individual employees' legal claims.  *Id*. at \*4.  Compass's reliance on *Hedges* is, therefore, unavailing.

So too is Compass's reliance on the proviso, "except as expressly limited and set forth in this Agreement," in the Management Rights Clause.  (*See* Def. Br. at 12).  Although the exception proviso would be relevant if the Agreement were a matter involving "the direction of the employees"—as it allows Compass to take action falling within that description if the CBA does not expressly forbid it—the Agreement is *not*, as discussed above, a matter involving "the direction of the employees."  Thus, the fact that the CBA does not expressly forbid arbitration agreements with individual employees does not mean that the CBA authorizes such agreements.  *Hedges* itself recognizes that "[a] CBA's mere silence on a specific matter or issue [ ] does not necessarily justify an employer's direct dealings with a union-represented employee."  *Hedges*, 2020 WL 4481657, at \*4.  Rather, "[t]he duty to bargain generally continues during the term of a collective-bargaining agreement with respect to mandatory subjects of bargaining not covered by the CBA."  *Id.*

This brings us to Compass's argument that the Agreement was authorized by the CBA's language allowing Compass to "make and enforce reasonable work rules." (Tr. at 24:7-26:9; Def. Supp. Ltr. at 3-4).  This argument immediately encounters a formidable textual obstacle.  The language upon which Compass relies is contained within the "including but not limited to" part of the Management Rights Clause. "Including" is used to indicate that the specified thing "is part of the whole group or category being considered."  INCLUDING, Oxford English Dictionary, *available at*

41

https://www.oed.com/dictionary/including_prep?tab=meaning_and_use#1210361340 (last visited March 20, 2026); *see also* INCLUDE, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/include ("to take in or comprise as a part of a whole or group") (last visited March 20, 2026); INCLUDE, Black's Law Dictionary (12th ed. 2024) ("[t]o contain as part of something"). Normally, an "including" clause cannot be read to *expand* the scope of the main, independent clause to which it is subordinate.  *See, e.g.*, *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 330-31 (5th Cir. 2023) (rejecting reading of "the dependent clause" (*i.e.*, the "including" clause) "as extending the scope of" a contractual definition); *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (Gorsuch, J.) ("The more general term informs the subsequently listed examples, not the other way around[.]").[15]

Here, the Management Rights Clause of the CBA limits those rights to "[t]he management of the business and the direction of the employees."  The "including" clause then provides examples of those terms.  It would be illogical to read the examples (including "work rules") as embracing something that falls outside the scope of "[t]he management of the business and the direction of the employees."  In other words, if, as discussed above, the Agreement is not encompassed by "[t]he

---

[15] Then-Judge Gorsuch's opinion in *Penncro Assocs.* provides an illuminating example.  Suppose a doctor prescribes that "You really should not eat fried foods—and this includes, but is not limited to, meat and potatoes."  The dictionary definition of "include," as well as ordinary usage and common experience, "does not suggest that the patient should avoid *all* meat and potatoes, but only those that are parts or components of the initial, larger group of fried foods (say, chicken fried steak and french fries)."  499 F.3d at 196 (emphasis in original).

management of the business and the direction of the employees," then logically it cannot be encompassed by the examples given of such actions.[16]

Even if Compass's argument could surmount this initial obstacle, it runs aground on the language of the "including" clause itself.  The plain meaning of the term "work rules" connotes rules that govern conduct *in the workplace.*  As the NLRB's Office of General Counsel has explained: "In common parlance, the term 'work rules' refers to company policies governing employee conduct in the workplace and company procedures directing employees in the performance of their work.  That is the plain, ordinary meaning of the term[.] . . .  No reasonable reader would characterize a separate contractual instrument which has little to do with job duties or the performance of work for the [c]ompany . . . as itself a 'work rule.'"  Brief for the NLRB, *Minteq Int'l v. NLRB*, Nos. 16-1276, 16-1335, at \*33-34 (D.C. Cir. filed Feb. 6, 2017).

In *Minteq*, an employer argued that it had the right to enter into Non-Compete and Confidentiality Agreements ("NCCA") with employees, without bargaining with the union, by virtue of a management rights clause in the CBA that included the right to "issue, amend and revise work rules."  The NLRB rejected the employer's argument, finding that the NCCA triggered a mandatory subject of

---

[16] "[T]o be sure, parties to a contract are free to define their terms in any manner they wish." *Penncro Assocs.*, 499 F.3d at 1157.  If "agreements to arbitrate" had been one of the examples listed in the "including" clause, that would have shown that the parties considered such agreements to be part of Compass's "direction of the employees," even though the ordinary meaning and usage of "direction of the employees" does not embrace arbitration agreements.  But the CBA does not do so, and "while the parties may depart from the meanings associated with ordinary English and existing law, courts will recognize and give effect to such private definitions only where the parties' intention to deviate from common usage is manifest." *Id.*  No such intention is manifest here.

bargaining and that the "work rules" language in the management rights clause did not constitute a waiver of the union's right to bargain. *Minteq Int'l, Inc.*, 364 NLRB 721, 724-25 (2016); *see also id.* at 723 (noting that the NCCA "clearly affect[s] employees' terms and conditions of employment in ways that extend beyond work rules governing employees' conduct in the workplace"). Notably, although the Board applied the then-prevailing clear and unmistakable waiver standard, it also found that "[e]ven under the 'contract coverage' analysis [which had been adopted by some courts], the [employer's] argument would fail." *Id.* at 724 n.14. The D.C. Circuit, "[i]nterpreting the CBA *de novo*," affirmed the Board's ruling. *Minteq Int'l, Inc. v. NLRB*, 855 F.3d 329, 334 (D.C. Cir. 2017).

Labor arbitrators have likewise recognized that the term "work rules" refers to rules governing an employee's conduct in the workplace. *See, e.g., Am. Fed. of State, Cnty. & Mun. Emps.*, Lab. Arb. Awards 08-2 ARB [¶ 4268] (C.C.H.), 2008 WL 10962366 (Apr. 27, 2008) ("Normally, when industrial relations specialists refer to 'work rules', they are referring to a list of 'do's' and 'don'ts' that the Employer typically posts in order to notify employees of its expectations with regard to their work-related conduct and of the consequences resulting from 'work rule' violations."); *Germantown Mun. Emps. Union, Loc. 3024, Dist. Council 40, AFSCME, AFL-CIO*, Case 57, No. 64053, MA-12791, at 9 (Nov. 1, 2005) ("[W]ork rules refer to the directives and standards established by an employer that govern how an employee functions in the workplace.") (available on the website of the Wisconsin Employment Relations Commission); *United Food & Comm. Workers*

*Union, Loc. 588, U.F.C.W., AFL-CIO v. Foster Food Prods.*, Nos. CV-F-93-5557 OWW, CV-F-93-5319 OWW, 1994 WL 570367, at \*5 (E.D. Cal. May 23, 1994) (quoting arbitrator's ruling finding that employer's unilateral implementation of drug testing policy was not permitted under management rights clause as, "strictly speaking, a drug testing policy is not a work rule").  Dictionary definitions, while sparse, are in accord.  *See, e.g.*, *Work Rules*, The Random House Dictionary of the English Language (2d ed. 1987) ("[A] set of rules, usually established by one or more unions in an agreement with management, specifying the tasks to be done by each employee."); *Work Rules*, Dictionary.com (same); Harold S. Roberts, Roberts' Dictionary of Industrial Relations 794 (1986) (defining "work rules" as "[t]he regulations in accordance with which work is done").  Accordingly, the ordinary meaning of the term favors Mercedez's interpretation.

Moreover, as Mercedez argues, the rest of the language in the "including" clause also supports her interpretation.  (Pl. Supp. Ltr. at 3).  "Under familiar contract interpretation principles, each item in a list of items is interpreted by the company it keeps," *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 390 (S.D.N.Y. 2023)—what is known as the doctrine of *noscitur a sociis.  See Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 210-11 (2d Cir. 2016).[17]  Here, the

---

[17] Mercedez's argument invokes the doctrine of *ejusdem generis* (Pl. Suppl. Ltr. at 3), but she is mistaken.  That doctrine holds that "general terms that follow specific ones are interpreted to embrace only objects of the same kind or class as the specific ones." *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008), *abrogated on other grounds by Lagos v. United States*, 584 U.S. 577 (2018). Typically, it is applied when a general phrase such as "or any other" or "or otherwise" follows a list of specific terms. *Elecs. & Telecomms. Rsch. Inst. v. Acacia Rsch. Grp., LLC*, No. 15 Civ. 3419 (VSB), 2017 WL 2389699, at \*7 (S.D.N.Y. June 1, 2017).  That is not the case here.  The phrase "work rules" does come at the end of the items listed in the "including" clause, but it is not meaningfully less specific than the terms that precede it.  Nonetheless, the "broader" interpretive canon of *noscitur a*

term "work rules" follows the terms "assign work," "schedule working hours," and "overtime and working days," all of which clearly refer to day-to-day operations in the workplace.  Meanwhile, the terms "right to hire," "promote," "discipline and discharge," and "layoff for lack of work" that appear elsewhere in the clause relate to the employer's ability to determine who is an employee and under what circumstances that relationship can be initiated, modified, or terminated.

Arbitration agreements are different from these categories.  Rather than govern conduct in the workplace, an arbitration agreement specifies the forum in which disputes between a worker and Compass shall be resolved.  Interpreting the term "work rules" to cover that process, which takes place outside of work, violates the plain meaning of the Management Rights Clause and basic canons of contract interpretation.  And, indeed, employers themselves frequently understand arbitration agreements to be separate from work rules.  *See, e.g.*, *Mancilla v. ABM Indus., Inc.*, No. 20 Civ. 1330 (KPF), 2020 WL 4432122, at *3 (S.D.N.Y. July 29, 2020) (employer requiring employees to sign "Mutual Arbitration Agreement Acknowledgment" and, separately, "Work Rules Acknowledgment"); *Starbucks Corp. & Workers United*, No. JD(SF)-17-24, 2024 WL 2880143, at *1 (NLRB Div. of Judges June 7, 2024) (employer requiring employees to sign a "Mutual Arbitration

---

*sociis*—that "a word is known by the company it keeps," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)—does apply here.  *See Noscitur a Sociis*, Black's Law Dictionary (12th ed. 2024) ("The *ejusdem generis* rule is an example of a broader linguistic rule or practice to which reference is made by the Latin tag *noscitur a sociis*.  Words, even if they are not general words like 'whatsoever' or 'otherwise' preceded by specific words, are liable to be affected by other words with which they are associated." (quoting Rupert Cross, *Statutory Interpretation* 118 (1976))).

Agreement" and separately setting forth "work rules" in "Standards of Business Conduct" and "Partner Guide" documents).

In support of its argument, Compass claims that the NLRB has long held arbitration agreements to be "a type of work rule." (Def. Supp. Ltr. at 3). Compass relies primarily on *Utility Vault Co.*, 345 NLRB 79 (2005). In *Utility Vault*, the Board affirmed a ruling by an administrative law judge ("ALJ") that an employer had violated Sections 8(a)(1) and 8(a)(5) of the NLRA, *see* 29 U.S.C. § 158(a)(1) and (a)(5), by unilaterally implementing a policy of requiring new employees to sign arbitration agreements. At the end of its analysis, the ALJ noted that "an employee who does not sign the [arbitration agreement] within three days of hire is subject to termination. It is well established that work rules that can be grounds for discipline are mandatory subjects of bargaining." *Utility Vault*, 345 NLRB at 83. According to Compass, this means that arbitration agreements must be deemed "work rules" under the Management Rights Clause. (Def. Supp. Ltr. at 3-4).

Compass's argument is without merit. The issue under consideration in the relevant portion of the *Utility Vault* decision was whether the employer had violated Section 8(a)(5) of the NLRA by refusing to bargain with the union over a mandatory subject of bargaining within the union's exclusive representative authority. *See Utility Vault*, 345 NLRB at 82-83. In analyzing that question, the ALJ was not construing the term "work rules" as used in a CBA or any other contractual provision or statutory or regulatory enactment. Still less did *Utility Vault* hold that a management rights clause preserving management's authority to issue "work

rules" permits the employer to require individual employees to enter into arbitration agreements. To the contrary, *Utility Vault* held that the employer *violated* Section 8(a)(5) of the NLRA by unilaterally implementing the arbitration agreement without giving the union prior notice and an opportunity to bargain. *Id.* at 83. It would be peculiar indeed to read this decision as allowing Compass to unilaterally implement the Mutual Arbitration Agreement in this case.

Peculiar, and also unwarranted. By the time he mentioned "work rules," the ALJ in *Utility Vault* had already concluded that the arbitration agreement improperly implicated mandatory subjects of bargaining by changing the terms and conditions of employment. *Id.* ("The [arbitration agreement] covers failure to pay wages or benefits, negligence, tort claims, and wrongful termination, all of which are mandatory subjects of bargaining. Whether these mandatory subjects should be resolved by arbitration is a matter for collective bargaining."). In the paragraph upon which Compass relies, the ALJ considered an *additional* way in which the employer's conduct implicated a mandatory subject of bargaining. That issue arose from the fact that "an employee who does not sign the [arbitration agreement] within three days of hire is subject to termination." *Id.* It was in this context that the ALJ invoked the principle that "work rules *that can be grounds for discipline* are mandatory subjects of bargaining." *Id.* (emphasis added). However, Compass's Mutual Arbitration Agreement does not raise that issue. Compass does not assert the right to fire an employee who refuses to be bound by the Agreement; indeed, the Agreement allows employees to opt out of the Agreement within 30 days. (Bailey

Decl. Ex. A). Such an Agreement does not neatly fit into any standard conception of a "work rule."

Compass also argues that the NLRB "consistently analyzes the lawfulness of arbitration agreements through the same analytical framework as it analyzes other work rules." (Def. Supp. Br. at 3). Here again, the cases it cites, such as *Anderson Enterps., Inc.*, 369 NLRB No. 70 (May 8, 2020), and *AWG Ambassador, LLC*, 363 NLRB 1250 (2016), do not examine whether an arbitration agreement constitutes a "work rule" under a CBA or a management rights clause in a CBA. Nor do they involve the question of whether the employer violated Section 8(a)(5) of the NLRA by unilaterally implementing an arbitration agreement without bargaining with the union. Rather, they consider whether the substance of the arbitration agreement was unlawful under Section 8(a)(1) by interfering with employees' Section 7 rights to seek relief in an administrative or judicial forum. *See Anderson Enterps.*, 369 NLRB No. 70, at *3; *AWG Ambassador*, 363 NLRB at 1250.

Compass seizes on the fact that these cases apply the NLRB's general standard for evaluating a Section 8(a)(1) claim. *AWG Ambassador*, 363 NLRB at 1255 ("When evaluating whether a rule, including a mandatory arbitration agreement, violates Section 8(a)(1), the Board applies the test set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004)."); *Anderson Enterps.*, 369 NLRB No. 70, at *3-4 (applying standard set forth in *Boeing Co.*, 365 NLRB No. 154 (2017), which briefly supplanted *Lutheran Heritage* before being overruled in *Stericycle, Inc.*, 372 NLRB No. 113 (Aug. 2, 2023)). In applying this general

standard, the NLRB sometimes frames the question as whether the employer has adopted an impermissible "work rule." *See, e.g.*, *Lutheran Heritage*, 343 NLRB at 646 (holding that an employer violates Section 8(a)(1) "when it maintains a work rule that reasonably tends to chill employees in the exercise of their Sec[.] 7 rights"); *Anderson Enterps.*, 369 NLRB No. 70, at *2 n.3 (describing *Boeing* as having "delineate[d] three categories of work rules") (internal citation omitted).  Many work rules, of course, can raise Section 8(a)(1) concerns.  That was true, for example, in *Lutheran Heritage*, which involved rules prohibiting, *inter alia*, abusive and profane language, harassment, and verbal and physical abuse "intended to maintain order in the employer's workplace."  343 NLRB at 646.

But that does not mean that *only* work rules can violate Section 8(a)(1).  *See Boeing Co.*, 365 NLRB No. 154, at *2 (announcing new standard applicable to "employment policies, work rules and handbook provisions").  The form of the employer's action is irrelevant to its legality.  Thus, in analyzing arbitration agreements under the general standard for evaluating Section 8(a)(1) claims, decisions such as *Anderson Enterps.* and *AWG Ambassador* neither needed to, nor did, make any finding as to whether or not the arbitration agreement constituted a "work rule."  The question to be decided was whether the substance of the arbitration agreement impermissibly chilled employees' Section 7 rights.  Nothing turned on whether the arbitration agreement could or could not be characterized as a "work rule."

In short, the NLRB decisions cited by Compass are inapposite and offer no genuine support for Compass's sweeping assertion that "[t]he NLRB considers arbitration agreements a type of work rule." (Def. Supp. Ltr. at 3). And whatever meager, indirect support they might provide is overcome by the plain meaning of the term "work rules" and the NLRB's decision in *Minteq*. *Minteq* shows that the Board clearly does *not* consider such an agreement to be within the scope of a "work rules" provision in a management rights clause—the relevant question here. As noted, the NLRB in that case rejected the argument that a side agreement with individual employees, which had little to do with workplace conduct, constituted a "work rule" under the management rights clause. *Minteq*, 364 NLRB at 723-25. Although the agreement in that case was a Non-Compete and Confidentiality Agreement, the Court discerns no meaningful difference, relevant to whether the Agreement constitutes a "work rule" under the Management Rights Clause, between that agreement and the arbitration agreement in this case.

Accordingly, the Court concludes that the Union did not waive its right to bargain over the adoption of individual arbitration agreements applicable to its members.

### b.    Mercedez's Employment Status

Compass argues that Mercedez was not a member of the bargaining unit when she signed the Agreement, and thus no bargaining obligation with the Union existed, even if the CBA does not allow for extra-contractual agreements with Union members. (Def. Br. at 7-11). Compass contends that because Mercedez was only given a conditional offer of employment at the time her signature was required, she

was in a pre-employment phase, and so not yet a member of the bargaining unit. (*Id.* at 9).  Moreover, Compass argues that because Mercedez is no longer an employee or a member of the bargaining unit, Compass does not have a bargaining obligation with the Union with respect to Mercedez's arbitration agreement.  (*Id.* at 9-10).  Finally, Compass urges that, should the Court find that any ambiguity exists in the current circumstances, it should wait for the NLRB to issue its decision in a pending case that, according to Compass, presents the same issue.  (*Id.* at 10-11 (citing *Anheuser-Busch, LLC*, 367 NLRB No. 132 (May 22, 2019), Case No. 12-CA-094114); Reply at 6).

Mercedez counters that her hiring commenced prior to her signing the Agreement, as the Agreement was one of multiple onboarding documents sent to Mercedez.  (Pl. Br. at 3; Pl. Supp. Ltr. at 4).  Further, Mercedez asserts that even if she were not a member of the bargaining unit at the time she signed the Agreement, Compass's argument would impermissibly create a loophole allowing employers to bypass the protections of the NLRA merely by getting employees to sign arbitration agreements before their official start date.  (Pl. Br. at 4).  Mercedez also maintains that the Agreement "vitally affects the terms and conditions of bargaining unit employees," and thus was prohibited under the NLRA regardless of whether she was a union member at the time of signing the Agreement.  (*Id.* at 5-6). Finally, Mercedez objects to Compass's theory that the Agreement can take effect post-employment if it was ineffective during her employment.  (*Id.* at 8-9).

Under the NLRA, "wages, hours, and other terms and conditions of employment" are mandatory subjects of collective bargaining.  29 U.S.C. § 158(d). The Supreme Court has explained that the phrase "terms and conditions of employment" generally excludes "matters involving individuals outside the employment relationship," except when such matters "vitally affect[]" the terms and conditions of employment for current employees.  *Allied Chem. & Alkali Workers of Am., Loc. Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178-79 (1971); *see also NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 350 (1958) (holding that mandatory subjects of bargaining are those that "regulate[] the relations between the employer and the employees").  In *Pittsburgh Plate Glass*, the Supreme Court reversed the Board's finding that the terms and conditions of employment of active employees were "vitally" affected by a change in retiree benefits for former employees, as the "benefits that active workers may reap by including retired employees under the same health insurance contract are speculative and insubstantial at best."  404 U.S. at 180, 182.

As discussed above, agreements requiring employees to arbitrate claims, such as the Agreement here, are mandatory subjects of bargaining.  *See Mendez*, 346 F. App'x at 603 (citing *Allis-Chalmers Mfg.*, 388 U.S. at 180); *see also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 256 (2009) (holding that an agreement to arbitrate employment-related discrimination claims is a "freely negotiated term" of a collective-bargaining agreement that "easily qualifies as a 'condition of employment' that is subject to mandatory bargaining under [NLRA] § 159(a)"); *Litton Fin.*

*Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 199 (1991) ("[A]rrangements for arbitration of disputes are a term or condition of employment and a mandatory subject of bargaining."). Accordingly, if Compass were not permitted to enter into the Mutual Arbitration Agreement with Mercedez because it was a mandatory subject of collective bargaining, then the Agreement is invalid.

As an initial matter, the Court sees no reason why it should wait for the NLRB to issue its ruling in the *Anheuser-Busch* case. The Board's decisions are "not binding" on this Court. *Mayes v. Loc. 106, Int'l Union of Operating Eng'rs*, No. 86 Civ. 41 (NPM), 1995 WL 30576, at *27 n.44 (N.D.N.Y. Jan. 20, 1995), *aff'd sub nom. Mayes v. Jones*, 99 F.3d 402 (2d Cir. 1995). And the Court has no insight into when the Board might ultimately issue its decision in that matter, which was remanded back to it by the Eleventh Circuit in 2023. *See Int'l Bhd. of Teamsters Loc. 947 v. NLRB*, 66 F.4th 1294 (11th Cir. 2023). Moreover, it does not appear that the decision in *Anheuser-Busch* would necessarily, or even likely, resolve the issues in dispute here.[18]

---

[18] In *Anheuser-Busch*, Matthew C. Brown sued Anheuser-Busch in federal court for racial discrimination after he was terminated. *Id.* at 1296. Anheuser-Busch moved to compel arbitration under its Dispute Resolution Policy ("DRP"), to which Brown had agreed during the hiring process. *Id.* By its terms, however, the DRP applied only to salaried and non-union hourly employees, and Brown had been a non-salaried employee and a member of the union throughout his employment with Anheuser-Busch. *Id.* at 1298; *Anheuser-Busch*, 367 NLRB No. 132, at *9. In response to Anheuser-Busch's motion to compel, Brown filed an unfair labor practice charge with the NLRB, which the Regional Director prosecuted and an ALJ sustained. *See Anheuser-Busch*, 367 NLRB No. 132, at *11. Notably, however, that charge was not premised on the theory that Anheuser-Busch had violated the NLRB by procuring Brown's agreement to the DRP when he was hired. *See id.* at *1 n.4 ("There is no allegation that [Anheuser-Busch] violated the Act by requiring applicants, including Brown, to agree to final and binding arbitration under the DRP (unless a written contract provides to the contrary) as a condition of employment."). There was no such allegation because the DRP, by its terms, did not apply to individuals who became union members. Rather, Anheuser-Busch was found to have violated the NLRA *by filing its motion to compel arbitration* and thereby changing the terms and conditions of employment for union employees without notice to or

Turning to the merits, Compass is correct that the plaintiff in *Mendez* was a current employee and union member at the time he signed the arbitration agreement. *See Mendez*, 2008 WL 2945346, at *1. That was not the case in *Hedges*, however. In *Hedges*, the plaintiffs signed the applicable arbitration agreements "[b]efore their first day of work" and "[a] few days" before becoming members of the union. *Hedges*, 2020 WL 4481657, at *1-2. Like Compass here, the employer in that case argued that *Mendez* was inapplicable because the plaintiffs were not members of the bargaining unit at the time of signature. *Hedges*, No. 20 Civ. 870 (E.D.N.Y.), Dkt. No. 19 at 1-3. The *Hedges* court did not reach that question, finding instead that the arbitration agreement was allowed under the terms of the CBA for the reasons explained above. Accordingly, neither *Mendez* nor *Hedges* provides meaningful guidance on the issue.

---

bargaining with the union. *Id.* at *11. In coming to that conclusion, the ALJ found that, even after he was terminated, Brown remained an "employee" within the meaning of Section 2(3) of the NLRA and, thus, a member of the bargaining unit when Anheuser-Busch filed its motion to compel. *Id.*

The Board disagreed with the ALJ's ruling, concluding that barring Anheuser-Busch from filing a motion to compel arbitration in a court action impermissibly infringed upon the company's exercise of its First Amendment rights. *Id.* at *3. The Eleventh Circuit, in turn, vacated the Board's determination, finding that the Board had applied an erroneously narrow standard and remanding for a determination as to whether Anheuser-Busch's motion to compel arbitration "may be enjoined as having an objective that is illegal under federal law." *Int'l Bhd. of Teamsters Loc. 947*, 66 F.4th at 1297, 1317.

On remand, the Board may now need to decide whether Anheuser-Busch violated its mandatory duty to bargain under the NLRA by filing its motion to compel (an issue that it avoided reaching in its initial ruling). *See Anheuser-Busch*, 367 NLRB No. 132, at *3 & n.9. Even that is unclear, since Anheuser-Busch made a number of alternative arguments why the ALJ's ruling should be overturned. *See Anheuser-Busch, LLC*, No. 12-CA-094114, Respondent's Brief in Support of Exceptions (Oct. 24, 2013). But assuming the Board does reach that question, its decision would be unlikely to preclude Mercedez's claim here. That claim—as in *Mendez*, but unlike in *Anheuser-Busch*—is premised not on Compass's filing of its motion to compel, but on the theory that Compass violated its mandatory duty to bargain with the Union by requiring Mercedez to enter into the Mutual Arbitration Agreement.

Ultimately, the Court finds that it need not determine whether Mercedez was, as she claims, "already [ ] hired" when she signed the Agreement and thus "already a union member at the time of hiring pursuant to the CBA." (Pl. Br. at 3). Whether that was the case or not, it is undisputed that the Agreement was intended to and did govern the terms and conditions of Mercedez's employment *after* she became an employee and a member of the Union. To allow employers to usurp a union's exclusive bargaining role with respect to arbitration agreements indisputably affecting the employment terms and conditions of its members, based on the stratagem of obtaining the employee's assent during the hiring process, would elevate form over substance and subvert the clear command and purpose of the NLRA. Compass provides no authority that would countenance such a result.

Instead, Compass relies on *Star Tribune*, 295 NLRB 543 (1989). (Def. Br. at 8-9). In *Star Tribune*, the Board upheld a "preemployment drug and alcohol testing policy" on the ground that it did not vitally affect the terms and conditions of existing bargaining unit members and therefore was not a mandatory subject of bargaining. 295 NLRB at 547-48. It was not enough, the Board found, that a preemployment policy "may affect the composition of the bargaining unit," as "[a]ny hiring criterion or individual hiring decision affects the composition of the bargaining unit." *Id*. Additionally, the Board found that while "safety in the workplace is a mandatory subject of bargaining[,] . . . the testing of applicants does not vitally affect workplace safety." *Id*. at 548. Such concerns, the Board noted,

56

could "be addressed effectively in union proposals that seek posthiring testing of new employees." *Id.*

Compass argues that, just like the applicants in *Star Tribune* who had not yet begun work and needed to pass preemployment drug and alcohol testing before hiring, Mercedez had not begun work and needed to sign the Agreement. In addition, Compass points to *Utility Vault*, where the Board struck down the unilateral imposition of an individual arbitration agreement and distinguished *Star Tribune* on the ground that the arbitration agreement "by its terms applies to newly hired employees already on the payroll." 345 NLRB at 82. Accordingly, as Mercedez had not yet been hired, Compass argues that these Board decisions make clear that it was free to set such conditions regardless of the language of the CBA. (Def. Br. at 8-9).

But this analysis misunderstands the import of these decisions. As the NLRB recognized in *Utility Vault*, the preemployment hiring practice at issue in *Star Tribune* was a "one-time drug test" that only impacted job applicants prior to their being hired and becoming members of the bargaining unit. 345 NLRB at 82. An agreement to arbitrate that is not limited to claims arising from the preemployment hiring process, but instead—like the Compass Mutual Arbitration Agreement—applies to "*all legal claims* between us, including without limitation those that may arise out of or be related to *my employment*, compensation, or termination of employment" (Bailey Decl. Ex. A (emphasis added)), is different in kind.

57

*Utility Vault* demonstrates as much and undermines, rather than supports, Compass's position. In *Utility Vault*, the court struck down an arbitration agreement that employees needed to sign within three days of starting work. Contrary to Compass's assertion, *Utility Vault* did not strike down the arbitration agreement merely because the employees had already been hired. As the ALJ's decision made clear, what was "more important[]" was that the arbitration "agreement *continued to apply to employees throughout their employment with Respondent and even after severance of their employment.* [It] applie[d] to an employee's *past, present, and future claims.*" 345 NLRB at 82-83 (emphasis added)). Accordingly, the ALJ found that the arbitration agreement "does vitally affect the terms and conditions of bargaining unit employees[.]" *Id.* at 83. The same is true here. Enforcing the Agreement would equally thwart the NLRA's purpose to protect the Union's exclusive authority to bargain over the terms and conditions of its members.

Similarly, in *Minteq*, the employer required prospective employees to sign the NCCA at issue there during the hiring process. 364 NLRB at 723 n.12. Citing *Star Tribune*, the employer argued that the fact that the employee in question was only a "job applicant," and not yet an "employee," meant that it had no obligation to bargain with the union over the NCCA. *Id.* at 735. The ALJ squarely rejected that argument: "Whether or not [the employee] was a bargaining unit employee when he signed the NCCA is not dispositive of this case. Section 2 of the NCCA governed his conduct *throughout his employment* with Minteq." *Id.* (emphasis added). The Board

58

rejected the argument as well, explaining that "the NCCA is not the equivalent of a drug test" that affects prospective employees "without having any impact on terms and conditions once the applicants become employees." *Id.* at 723 n.12. Because the NCCA "applies to active bargaining-unit employees," the Board concluded, the "vitally affects" test of *Pittsburgh Plate Glass* "is inapplicable" and the NCCA implicated a mandatory subject of bargaining. *Id.*

The Board's decision in *Kysor Indus. Corp.*, 307 NLRB 598 (1992), *enfd. Kysor/Cadillac v. NLRB*, 9 F.3d 108 (6th Cir. 1993), further illustrates the point. There, the NLRB prevented the enforcement of drug testing for individual employees *during* their employment absent union approval, even though the employees had signed a form prior to their hiring in which they consented to later drug testing. *Id.* at 600. In doing so, the Board adopted the rationale of the ALJ, who determined that although *Star Tribune* made clear that "the contents of job application forms" are not a mandatory subject of bargaining, it would violate the NLRA for an employer, "unilaterally and without prior notice to or affording the Union an opportunity to bargain, [to] implement[] a policy and practice of requiring unit employees, or those who signed consent forms, to submit to drug screening tests in conjunction with medical treatment for on-the-job injuries, as a condition of employment." *Id.* at 602-03.

These authorities foreclose Compass's attempt to circumvent *Mendez*. *Mendez* holds that where an individual arbitration agreement "reaches *any* dispute, it relates to subjects that are within the union's exclusive bargaining realm, such as

59

seniority, wages, and conditions of employment, and is therefore unenforceable."

*Mendez*, 346 F. App'x at 603 (emphasis in original).  Compass's Mutual Arbitration

Agreement does precisely the same thing and affects bargaining-unit members'

terms and conditions of employment in precisely the same manner.  That Compass

enters into the Agreement before the employee's start date, rather than after,

makes the Agreement no more permissible.  "To hold otherwise would in effect open

a large loophole in Section 8(a)(5) by permitting the employer to unilaterally control

terms and conditions of employment through commitments imposed on job

applicants."  *Kysor*, 307 NLRB at 602-03.[19]

      That Mercedez is no longer employed by Compass does not alter this result.

The Agreement was void and unenforceable during Mercedez's employment, and

Compass cites no authority for the proposition that it could spring back to life, once

she was terminated, without her assent.  Such a contention is at odds with basic

principles of contract law.  *See Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d

28, 32 (2d Cir. 1997) ("A contract that is void *ab initio* is a 'nullity[.]'" (quoting

*Schneberger v. Wheeler*, 859 F.2d 1477, 1481 (11th Cir. 1988))); *Wells Fargo Bank,*

*N.A. v. Estate of Malkin*, 278 A.3d 53, 66 (Del. 2022) (holding that subsequent

securitization and transfer of a life insurance policy, which was void as a matter of

---

[19] At oral argument, Compass contended that because Mercedez had the ability to opt out of the Agreement within 30 days, this supports its argument that the Agreement did not "vitally affect" the terms and conditions of her employment. (Tr. at 36:22-37:17).  But the Court has rejected the premise underlying this argument: that it makes a difference whether Mercedez had officially become an employee when she signed the Agreement.  As Compass concedes, the opt-out provision would not have saved the Agreement if it had been entered into while Mercedez was an employee. (*See id.* at 36:11-21 (stating that if arbitration agreement had been entered into while Plaintiff was a current employee, "that would be a mandatory subject of bargaining and we would have to bargain with the union . . . [e]ven if she had the right to opt out")).

law at inception, "does not bring the void policy back to life"); *Truglio v. Zurich Gen. Acc. & Liab. Ins. Co.*, 247 N.Y. 423, 160 N.E. 774, 774 (1928) (contract that was "no longer a live instrument" could not be enforced "unless life was breathed into it again by force of a new assent responsive to a new offer") (citation omitted); 17A C.J.S. *Contracts* § 184 (March 2026 update) ("A void contract is invalid or unlawful from its inception. It is a mere nullity and never attains legal effect as a contract."); 22 N.Y. Jur. 2d *Contracts* § 8 (Nov. 2025 update) ("A void contract is no contract at all; it binds no one and is a mere nullity.").

Moreover, as *Minteq* illustrates, a mandatory subject of bargaining can include agreements that "impose obligations on employees after they leave employment," like the non-compete and non-disclosure agreements at issue in that case. *Minteq*, 855 F.3d at 334; *see also Utility Vault*, 345 NLRB at 83 (making clear that application of an invalid arbitration agreement "after severance" would be impermissible). If Compass had sought the benefit of an arbitration provision governing post-employment claims in collective bargaining negotiations with the Union, the Union could have exercised its bargaining power, in a way that an individual employee could not, to either reject the demand or insist on a corresponding benefit for workers such as increased pay or benefits. That is the whole point of collective bargaining under the NLRA. *See J.I. Case. Co. v. NLRB*, 321 U.S. 332, 338 (1944) ("The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the

group.  Its benefits and advantages are open to every employee of the represented unit, whatever the type or terms of his pre-existing contract of employment.").

Accordingly, although it is supported by adequate consideration, the Agreement is not authorized by the CBA, violates the Union's exclusive bargaining rights under the NLRA, and must be found void and unenforceable under *Mendez*. As a result, the Agreement cannot be a basis for compelling Mercedez to arbitrate her claims.

## CONCLUSION

For the reasons set forth above, Defendant's motion to compel arbitration is **DENIED**.  The parties shall meet and confer and submit a joint status letter by no later than April 3, 2026 with their proposal for the next steps in this case (or, if they cannot agree, their competing proposals).

Dated:    New York, New York
          March 20, 2026

_____
GARY STEIN
United States Magistrate Judge